No. 24-1345

# United States Court Of Appeals
# For the Fourth Circuit

ALIA AL-SABAH,

*Plaintiff-Appellee*,

*v.*

WORLD BUSINESS LENDERS, LLC,

*Defendant-Appellant*,

On Appeal from the United States District Court for the District of
Maryland in Case No. 1:18-cv-02958-SAG, Judge Stephanie A. Gallagher

**OPENING BRIEF OF APPELLANT
WORLD BUSINESS LENDERS, LLC**

September 16, 2024

Stephen J. Rosenfeld
Patrick O'Meara
MCDONALD HOPKINS LLC
300 North LaSalle, Suite 1400
Chicago, IL 60654
312-280-0111
srosenfeld@mcdonaldhopkins.com
pomeara@mcdonaldhopkins.com

*Counsel for Defendant-Appellant*

34168859.4

**RULE 26.1 DISCLOSURE STATEMENT**

World Business Lenders, LLC does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock. No publicly held corporation has a financial interest in the outcome of this litigation.

34168859.4

# TABLE OF CONTENTS

Rule 26.1 Disclosure Statement ..................................................................1

Table of Contents ........................................................................................2

Table of Authorities ....................................................................................4

Jurisdictional Statement .............................................................................6

Introduction .................................................................................................7

Statement of Issues....................................................................................10

Statement of the Case................................................................................11

   I.   Agbodjogbe Defrauds Al-Sabah and Purchases the Pikesville Property
       Using Her Money Without Her Permission...............................................11

   II.  Agbodjogbe's First Two Loans From WBL. ...........................................13

   III. Agbodjogbe's Third Loan From WBL ...................................................16

   IV. Al-Sabah Sues WBL ..............................................................................19

Summary of Argument...............................................................................22

Standard of Review ...................................................................................25

Argument....................................................................................................25

   I.   WBL's Routine Loan To Agbodjogbe in 2016 Did Not Substantially
       Assist Him With A Fraud He Completed in 2014. ..................................25

      A.  WBL did not, as a matter of law, substantially assist Agbodjogbe
           in committing an underlying fraud against Al-Sabah.......................26

      B.  The district court's substantial assistance conclusion misapplies
           the law. ...............................................................................................32

          1.  The district court erred in concluding that WBL's loan
              substantially assisted an ongoing fraud by Agbodjogbe...........32

          2.  The district court erred in concluding that a routine loan from
              WBL constituted substantial assistance....................................35

   II.  WBL Was Not Willfully Blind to Agbodjogbe's Fraud When It Closed
        Loan Three. .............................................................................................39

      A.  WBL's actions following its discovery of the lis pendens on the
           Pikesville Property show that it did not suspect Agbodjogbe's
           fraud or seek to avoid learning about it. ...........................................39

      B.  The district court's conclusion that WBL was willfully blind is
           based on a key factual error and misapplied the law.........................43

34168859.4

1.  The district court erroneously found that WBL saw the Notice of Lis Pendens and knew its contents. ......................................43

2.  The district court's willful blindness analysis incorrectly applied a negligence standard. ................................................45

Conclusion .........................................................................................48

Certificate Of Compliance .................................................................49

Certificate Of Service.........................................................................50

34168859.4

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*,
   665 A.2d 1038 (Md. 1995) ................................................................26, 27, 35, 40

*Cromer Fin. Ltd. v. Berger*,
   137 F. Supp. 2d 452 (S.D.N.Y. 2001) ..............................................................29

*E.F. Hutton Mortg. Corp. v. Equitable Bank, N.A.*,
   678 F. Supp. 567 (D. Md. 1988) .......................................................................28

*Empire Realty Co. v. Fleisher*,
   305 A.2d 144 (Md. 1973) .................................................................................28

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011) .........................................................................................40

*Hoffman v. Stamper*,
   867 A.2d 276 (Md. 2005) .................................................................................40

*Iowa Pub. Employee's Ret. Sys. v. Deloitte & Touche LLP*,
   919 F. Supp. 2d 321 (S.D.N.Y. 2013) ..............................................................40

*JP Morgan Chase Bank v. Winnick*,
   406 F Supp. 2d 247 (S.D.N.Y. 2005) ...............................................................28

*Kafka v. Hess*,
   Civ. No. JKB-16-1757, 2017 WL 2439142 (D. Md. June 6, 2017) .......33, 34, 35

*Primavera Familienstifung v. Askin*,
   130 F. Supp. 2d 450 (S.D.N.Y. 2001) ..........................................................37, 38

*In re Rood*,
   482 B.R. 132 (Bankr. D. Md. 2012). (Opinion 51-52.) ...............................34, 35

*Schatz v. Rosenberg*,
   943 F.2d 485 (4th Cir. 1991) .........................................................................29, 38

34168859.4

*SEC v. Aragon Cap. Advisors, LLC*,
 No. 07 Civ. 919 (FM), 2011 WL 3278907 (S.D.N.Y. July 16,
 2011) .................................................................................................36, 37, 38

*State v. McCallum*,
 583 A.2d 250 (1991) (Chasanow, J., concurring) .............................................40

*Sutton v. FedFirst Fin. Corp.*,
 126 A.3d 765 (Md. App. Ct. 2015)...........................................................27, 39

*Texas Star Nut and Food Co., Inc. v. Tr. Bank*,
 632 F. Supp. 3d 664 (D. Md. 2022)..................................................................29

*Twitter, Inc. v. Taamneh*,
 598 U.S. 471 (2023)...............................................................................*passim*

*Virginia Elec. & Power Co. v. Bransen Energy, Inc.*,
 850 F.3d 645 (4th Cir. 2017) ...........................................................................25

## Statutes

28 U.S.C. § 1291 .................................................................................................6

28 U.S.C. § 1332.................................................................................................6

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. Appellant timely filed its notice of appeal on April 17, 2024.

34168859.4

# INTRODUCTION

This appeal arises from the district court's erroneous finding that World Business Lenders, LLC ("WBL") aided and abetted a fraud about which it did not know and that concluded years before WBL even became involved with the alleged perpetrator. Plaintiff Alia Salam Al-Sabah closed her eyes and wired—over and over again—vast sums of money to a man she hardly knew. And when she ultimately could not recover from the fraudster, she sought to foist liability for her bad decisions on WBL.

WBL serves businesses that lack access to traditional sources of credit. Lending to such borrowers is complex and risky, so WBL's loans carry high interest rates and are secured by real property. This appeal is about a March 2017 loan ("Loan Three") WBL made to a Baltimore restaurant owned by fraudster Jean Agbodjogbe.

The facts of this case read like a bad novel. Kuwaiti princess visits the United States, meets a small Senegalese restaurateur when she purchases food for a local mosque during Ramadan, returns to Kuwait, and—within a few months—decides that this restauranteur is the person who she should trust with millions of dollars to invest in real estate in the United States. Senegalese restaurateur [Agbodjogbe] defrauds Kuwaiti princess [Al-Sabah] out of more than $7.8 million and absconds

34168859.4

with the funds. The twist here is that when Al-Sabah could not get funds from Agbodjogbe, she blamed WBL for all her troubles.

WBL made three loans to Agbodjogbe's entities, all of which he secured using real estate procured with funds he took from Al-Sabah. Only one loan remains at issue here. Loan Three was secured by Agbodjogbe's personal residence in Pikesville, Maryland ("Pikesville Property"), which he bought in January 2015 using funds he swindled from Al-Sabah. But Agbodjogbe did not even first approach WBL about a loan until October 2015, and WBL did not fund the loan at issue until March 2017 (well after Al-Sabah had already sued Agbodjogbe for fraud). During underwriting for the loan, Agbodjogbe told WBL the large transfers of funds from Al-Sabah were gifts—which explanation he supported with filed gift tax returns and an interview of his accountant. WBL did notice on a title report—just before it funded Loan Three—that a lis pendens was filed against the Pikesville Property, but the title company removed that lis pendens from the report before funding (apparently because Al-Sabah incorrectly docketed the lis pendens against the wrong address). So WBL executives did not follow up on or even read the content of the notice of lis pendens.

Before closing, WBL followed its usual practice of ensuring the title company cleared title and requiring Agbodjogbe to obtain an attorney opinion letter stating that no litigation against the borrower (the restaurant), the guarantor (Agbodjogbe),

34168859.4

or the collateral (the Pikesville Property) posed a risk to the performance of the loan obligations. When the title company did so and Agbodjogbe succeeded in procuring such a letter, WBL closed and funded Loan Three.

With the benefit of hindsight, WBL's closing of Loan Three was a mistake. And Agbodjogbe not surprisingly defaulted on the loan. But WBL's arguably poor underwriting of the loan is a far cry from aiding and abetting a fraud. And the district court recognized that fact with regard to Loan One and Loan Two but erred in connection with its decision on Loan Three.

Finding aiding and abetting liability with regard to Loan Three required the district court to conclude that WBL was willfully blind to Agbodjogbe's fraud and that WBL's closing of Loan Three substantially assisted Agbodjogbe's fraud. The district court's decision on both of those issues in Al-Sabah's favor was wrong. Its conclusion that WBL substantially assisted a fraud that Agbodjogbe completed over two years before Loan Three closed (and about which she had already sued Agbodjogbe) misapplies the law and defies common sense. WBL's routine, arm's length loan to Agbodjogbe in 2017 simply could not have substantially assisted him in accomplishing a fraud that Al-Sabah was legally entitled to sue him over in 2015.

Nor was WBL willfully blind with respect to Agbodjogbe's fraud. Although WBL knew about the lis pendens, there was no evidence establishing that anyone at WBL knew, or even suspected, this fraud was the reason for the lis pendens. The

district court's contrary conclusion was based heavily on a mistaken finding that those at WBL had read and knew the contents of the Notice of Lis Pendens Al-Sabah filed—which contained her fraud allegations about the Pikesville Property. Compounding that error, the court misapplied the willful blindness standard by repeatedly faulting WBL for underwriting decisions that prevented it from discovering Agbodjogbe's fraud. At most, the court's analysis shows WBL made mistakes while underwriting Loan Three, not that it deliberately sought to avoid learning about Agbodjogbe's fraud (about which it had no suspicion).

For all these reasons, as set forth in detail below, the Court should reverse the district court's judgment in favor of Al-Sabah and enter judgment in favor of WBL.

## STATEMENT OF ISSUES

1.      Whether the district court misapplied the law of aiding and abetting in holding that WBL substantially assisted Agbodjogbe with a fraud he committed over two years before the closing of Loan Three.

2.      Whether the district court's conclusion that WBL was willfully blind to Agbodjogbe's fraud was based on a clearly erroneous finding that WBL's knowledge at the time of closing of Loan Three included details about Agbodjogbe's fraud contained in a Notice of Lis Pendens no one at WBL ever read.

3.      Whether the district court misapplied the law of aiding and abetting in concluding that WBL was willfully blind to Agbodjogbe's fraud by applying a negligence standard rather than a willful blindness standard.

## STATEMENT OF THE CASE

### I.      Agbodjogbe Defrauds Al-Sabah and Purchases the Pikesville Property Using Her Money Without Her Permission.

In June 2014, Alia Al-Sabah—a member of the Kuwaiti royal family—visited Baltimore, Maryland and met Jean Agbodjogbe at a small restaurant he owned and operated called Nailah's Kitchen. (Opinion 2, ¶¶ 1, 4.) Al-Sabah bought food from Nailah's Kitchen as a donation to a local mosque during Ramadan. (*Id.* 2, ¶¶ 5-8.) After she returned to Kuwait, Al-Sabah stayed in touch with Agbodjogbe to confirm appropriate delivery of the food to the mosque during Ramadan, which he successfully coordinated. (*Id.* 2, ¶¶ 5-8.) Al-Sabah and Agbodjogbe's continued communications eventually led Al-Sabah to send about $7.8 million to Agbodjogbe to invest both in Agbodjogbe's business and in real estate in the United States. (*Id.* 3, 5, 14, ¶¶ 11, 27, 99.) Instead, Agbodjogbe bought real estate for himself and absconded with the remaining funds. (*See, e.g.*, *id.* 6-7, 11 ¶¶ 40, 74-82; *id.* 33.)

It started small when Al-Sabah agreed in September 2014 to send $150,000 to Agbodjogbe for a 50% equity investment in his restaurant, which they placed into a new entity called N&A Kitchen LLC. (*Id.* 3-4, ¶¶ 9-11, 17, 24.) Things ramped up the next month when Al-Sabah sent Agbodjogbe an $825,000 wire transfer. (*Id.* 5,

34168859.4

¶¶ 27-29.) Agbodjogbe led Al-Sabah to believe that those funds would be used to purchase and renovate an apartment building through an entity wholly owned by her and named after her nine daughters. (*Id.* 5, ¶¶ 27-29.) The entity—9 Jewels, LLC— was named after Al-Sabah's nine daughters but was wholly owned by Agbodjogbe. (*Id.* 5, 11 ¶¶ 29, 76-77.) And Agbodjogbe never purchased the apartment building. (Tr. Vol. III 55:5-12.)

Then, in January 2015, Agbodjogbe informed Al-Sabah about two more properties on the market, which Agbodjogbe proposed using as two new restaurant locations for Nailah's Kitchen. (Opinion 6, ¶¶ 34-37.) On board with that plan, Al-Sabah wired Agbodjogbe $305,966 with the understanding he would use it to buy one of those properties on behalf of 9 Jewels for use by Nailah's Kitchen. (*Id.* 6 ¶¶ 38-39.)

But shortly after receiving that wire (on January 28, 2015), Agbodjogbe instead used Al-Sabah's money to purchase a $469,990 home for his family without her knowledge or consent. (*Id.* 6-7 ¶ 40.) The home—the Pikesville Property—was located at 103 Mt. Wilson Lane in Pikesville, Maryland. (*Id.*)

Over the next year-and-a-half, Al-Sabah sent Agbodjogbe millions of dollars of additional wire transfers, the last of which occurred on July 18, 2016. (*Id.* 13-14, ¶¶ 94, 99.) In all, from September 2014 to July 2016, Al-Sabah wired Agbodjogbe

34168859.4

around $7.8 million, with the false understanding that nearly all of it was being used to acquire for real estate for entities she controlled. (*See id.* 13, 14, ¶¶ 94, 99.)

## II.    Agbodjogbe's First Two Loans From WBL.

Defendant World Business Lenders, LLC is an alternative business lender that lends money to small businesses that generally do not qualify for loans from traditional lending sources, like banks. (*Id.* 14, ¶¶ 100, 101.) For this reason, WBL loans tend to have higher interest rates than loans from traditional lenders and are secured with real estate. (*Id.* 14, ¶ 100.)

In December 2015, Agbodjogbe applied for a WBL loan for N&A Kitchen. (*Id.* 15-16, ¶¶ 105, 108.) WBL began its review of the application, including performing a review of N&A Kitchen's projected business revenues, use of proceeds, monthly bank statements, and proposed collateral. (*Id.* 7, 15, ¶¶ 45, 106.) The proposed collateral was a property at 306-310 N. Howard Street that Agbodjogbe purchased through 9 Jewels with Al-Sabah's money. (*Id.*) During this review, WBL credit analyst Jon Pezzino noticed several large wire transfers in the bank records Agbodjogbe submitted. (*Id.* 15, ¶ 107.)

WBL investigated the wire transfers to ensure that they were, in fact, gifts. (*Id.* 41.) Pezzino conducted a "merchant interview" of Agbodjogbe, in which Pezzino interrogated Agbodjogbe about the source and purpose of the wires. (*Id.* 16 ¶¶ 110, 112.) Agbodjogbe told Pezzino that the wires were gifts from a wealthy

13

family in Kuwait, which gifts he reported on his personal tax return. (*Id.* 16 ¶112.) Pezzino requested confirmatory documentation, and Agbodjogbe produced IRS Form 3520 (Annual Return to Report Transactions with Foreign Trusts and Receipt of Certain Foreign Gifts) that was prepared and filed for Agbodjogbe by a certified public accountant—David Leichter. (*Id.* 16 ¶¶ 112-114.)

WBL senior management, upon learning of the large wire transfers and assuring themselves that they did not pose money-laundering concerns, directed Pezzino to speak directly with Leichter to confirm the characterization of the wires as gifts. (*Id.* 17-18, ¶¶ 119-124.) Pezzino spoke with Leichter on January 26, 2016. (*Id.* 18, ¶ 125.) On that call, Leichter corroborated Agbodjogbe's story that the wires were gifts and that the accountant had actually met the princess. (*Id.* 18-19, ¶¶ 126, 127.)

Pezzino reported to Cem Oztreves—WBL's senior investment officer and the assigned underwriter on the N&A kitchen loan—about the call, and Oztreves relied on Pezzino's description of the call in approving Agbodjogbe's application for a $250,000 loan. (*Id.* 19, ¶ 130-132.) This loan ("Loan Zero") never funded because Agbodjogbe ultimately withdrew his application. (*Id.* 19, ¶ 133.) But Agbodjogbe soon returned with a new application, and WBL relied on the diligence it did during Loan Zero in the underwriting for that loan. (*Id.* 41, n. 28.)

In May 2016, Agbodjogbe sought a $600,000 business loan to N&A Kitchen ("Loan One") and proposed to pledge as collateral a $2.1 million condominium in New York he purchased in August 2015 in the name of 9 Jewels. (*Id.* 20, ¶¶ 134-135.) WBL again performed significant diligence on the loan application, which included examining updated bank statements, reviewing projected revenues for the business, evaluating the collateral, obtaining an accountant opinion letter, and performing another merchant interview. (*Id.* 20-22, ¶¶ 136-140, 143-145, 149-151.) During this second merchant interview, Pezzino again discussed the large wires with Agbodjogbe, who again assured Pezzino they were gifts; and Agbodjogbe also confirmed that the collateral property had been purchased with this gift money. (*Id.* 20 ¶¶ 137-140.) Based on the previous diligence as well as the confirmatory conversations during this application process, Pezzino and Oztreves remained convinced that the wires were gifts. (*Id.* 20-22 ¶¶ 140, 148.) WBL approved Loan One on May 24, 2016, and WBL funded the $600,000 loan on May 27, 2016. (*Id.* 21, 22, ¶¶ 143, 152.)

A few months later, Agbodjogbe approached WBL about refinancing Loan One with a new loan that had a total value of $1.2 million ("Loan Two"). (*Id.* 22, ¶ 153.) WBL performed another round of diligence, obtaining updated revenue projections, bank records, and an attorney opinion letter, as well as performing a third merchant interview, where Pezzino again asked him about the wires. (*Id.* 23-

15

24, ¶¶ 155-158, 164.) WBL's investment committee approved Loan Two on August 9, 2016, and WBL funded it on August 26, 2016. (*Id.* 23, 24, ¶¶ 156, 165.) Like Loan One, Loan Two was secured by the New York condo owned by 9 Jewels. (*Id.* 24, ¶ 165.)

In December 2016, Agbodjogbe repaid WBL in full for Loan Two. (*Id.* 25, ¶ 166.)

## III.   Agbodjogbe's Third Loan From WBL

Agbodjogbe returned to WBL seeking a third loan in March 2017 ("Loan Three"). (*Id.* 25, ¶ 167.) The borrowers for this $360,000 loan were N&A Kitchen and a new entity—N&A Kitchen II, LLC. Unlike Loans One and Two, Agbodjogbe proposed that his primary residence—the Pikesville Property he purchased with Al-Sabah's money in January 2015—be used to secure Loan Three. (*Id.*)

During the underwriting process, WBL received a Report of Title for the Pikesville Property (the "Title Report") from a title insurance company. (*Id.* 25, ¶ 168.) The Title Report included a title commitment and stated that "[t]itle is vested in Jean Agbodjogbe and discloses no mortgages and (7) judgments/liens." (*Id.* (quoting Title Report, Fakioglu Dep. Ex. 39).) One "judgment" listed in the Title Report was from a case captioned *Al Sabah vs. Agbodjogbe et al.*, filed in Maryland state court on March 20, 2017. (Opinion 25, ¶ 169.) The Title Report identified a Notice of Lis Pendens from Baltimore County associated with that case. (*Id.*)

WBL employee Yasemin Fakioglu, who was involved with Loan Three in a sales capacity but not involved in its approval, spoke with Agbodjogbe about it and made the connection that the plaintiff was the woman who had wired him large sums of money. (*Id.* 26-27, ¶¶ 173-174; Fakioglu Dep. 85:15-24.) Nothing in Fakioglu's testimony, however, indicates she ever learned the nature of the claims against Agbodjogbe on which the lis pendens was based. (*See* Fakioglu Dep. 113:6-114:15.) Fakioglu relayed what she learned on her call with Agbodjogbe to two other WBL employees. (Opinion 27, ¶ 175.) Unfortunately, the WBL employees critical to the approval of Loan did not make the same connection as Fakioglu—*i.e.*, that the plaintiff in the lawsuit was the sender of the wires—because the underwriting review form that went to the credit committee incorrectly identified the *Al Sabah* case with the lis pendens as a "prior owner judgment" that "was to be removed…." (*Id.* 28 ¶ 182 (quoting DTX031).)

On March 23, 2017, WBL's investment committee approved Loan Three. (Opinion 28, ¶ 183.) The approval was subject to certain closing conditions, which included obtaining title insurance. (DTX031 at 48.) As part of the closing process, and consistent with the notation on the list of judgments on the underwriting review form, WBL contacted the title insurance company, asking it to take another look at the issues identified and to "omit [the title issues] that had belonged to the prior owner or omit [the title issues] that don't belong." (Opinion 30, ¶ 192 (quoting Tr.

Vol. I 112:7-13).) This is a common practice of WBL, as most title reports WBL receives contain blemishes that are resolved, such as released mortgages and old claims and judgments. (Tr. Vol. II 143:7-15.)

Around the same time, an employee in WBL's title department escalated the lis pendens to Chief Operating Officer Robert Pardes. (Opinion 28, ¶ 180.) But before Pardes investigated the issue, the title insurer provided to an updated title report that removed the lis pendens and agreed to provide title insurance on the Pikesville Property. (*Id.* 29, ¶ 191.) Pardes's understanding was that the title insurer found that the lis pendens was initially included by mistake because it had actually been filed against a different property. (*Id.*) Because Pardes considered the issue resolved, he never investigated the lis pendens himself. (*Id.* 28, ¶ 180.)

Another closing condition for Loan Three was that Agbodjogbe obtain an attorney opinion letter containing certain representations. (DTX031 at 48; Tr. Vol. II 144:11-145:10.) Agbodjogbe managed to obtain such a letter from a firm called Saller & Bishop. (Opinion 31, ¶ 198; DTX031 at 102-105.) Among other things, the letter stated that "[t]o our knowledge, after due inquiry, there is no . . . threatened or pending litigation against Borrower [N&A Kitchen, LLC / N&A Kitchen II LLC], Corporate Guarantor, Guarantor [Agbodjogbe], and Collateral Owner [Agbodjogbe] that could adversely impact the ability of Borrower, Corporate Guarantor, Guarantor

18

and Collateral Owner to perform the obligations under the terms of the Loan Documents." (Opinion 31 ¶ 198 (quoting DTX031 ¶ 7).)

After the title insurer agreed to insure the title on the Pikesville Property and after receiving the Saller & Bishop letter, WBL was no longer concerned about the lis pendens that appeared on the initial title report and proceeded to close Loan Three. (Opinion 31, ¶¶ 199-200; Tr. Vol. II. 145:15-146:10.)

## IV.    Al-Sabah Sues WBL

In September 2018, Al-Sabah filed an eleven-count complaint against WBL, two other lenders that Agbodjogbe borrowed money from, Agbodjogbe's loan broker (both the individual and brokerage entity), and a former WBL employee. (Complaint 2, 38-49.) The district court granted summary judgment in favor of WBL on all but two of her claims: aiding and abetting fraud and unjust enrichment. (Dkt. 152.) A four-day bench trial was held on those claims from October 23-27.[1] (Opinion 1.)

Al-Sabah's aiding and abetting claim alleged that WBL aided and abetted Agbodjogbe's fraud by issuing Loans One, Two, and Three, which were secured by real estate purchased with money she sent to Agbodjogbe under false pretenses. (*Id.* 32.) As to Loans One and Two, the district court rejected Al-Sabah's claim because she failed to prove the knowledge element of aiding-and-abetting. (*Id.* 40.) Al-Sabah

---

[1] The court found in favor of WBL on unjust enrichment for all three loans.

proceeded on a willful blindness theory, and the court concluded that she "failed to show that WBL had knowledge of, or was willfully blind to, Agbodjogbe's fraud during its underwriting of Loans One and Two." (*Id.*) The court pointed to the facts of WBL's substantial investigation of the large wires, which "assuaged WBL's concerns and supported its understanding that Agbodjogbe received the wires as gifts from a wealthy overseas friend." (*Id.* 41.) Al-Sabah's argument to the contrary were "best couched in terms of negligence or recklessness and [fell] short of what the willful blindness standard requires." (*Id.* 43.)

The district court, however, concluded that Al-Sabah had proven that WBL had been willfully blind with respect to Loan Three. (*Id.*) It reasoned that "at least eight days before WBL funded Loan Three on March 30, 2017, it knew that Agbodjogbe had just been sued for fraud by the very person who sent him the large wires and that person, Al-Sabah, contested title to the very property Agbodjogbe pledged as collateral for Loan Three." (*Id.* 44.) The court based that conclusion on four facts WBL purportedly "became aware" of: "(1) Agbodjogbe sought a third WBL loan secured by a residential property in Pikesville, Maryland; (2) an initial title report (dated March 22, 2017) contained a Notice of Lis Pendens against the Pikesville Property, which had been filed in Maryland state court on March 20, 2017, under the case caption Al Sabah vs. Agbodjogbe et al.; (3) the Notice of Lis Pendens included Al-Sabah's fraud complaint filed in federal court against Agbodjogbe and

20

several of his business entities, including 9 Jewels, N&A Kitchen, and N&A Kitchen II; and (4) WBL's own closing department conducted a PACER search on March 24, 2017, which identified Al-Sabah's federal fraud suit against Agbodjogbe." (*Id.* 43-44.)

As to WBL's explanation that it proceeded with Loan Three despite the lis pendens because the title company insured over it and it received an attorney opinion letter, the district court said these reasons "cannot withstand scrutiny" in light of the record. (*Id.* 44.) As to the title insurance policy, the court honed in on the policy's language, which disclaimed that it was a representation as to the state of title. (*Id.* 45.) And the court deemed Pardes's decision not to investigate the lis pendens himself based on the insurer's decision to remove the lis pendens from the title report willfully blind in light of his purported knowledge "that the lis pendens applied to the Pikesville Property" based on the substance of the Notice of Lis Pendens. (*Id.* 45-46.)

With respect to the attorney-opinion letter, the court gave it no "meaningful weight" because "there is no evidence that the attorney who signed the letter possessed information about the lis pendens or Al-Sabah's fraud suit," or that "the attorney knew what WBL knew about Al-Sabah…." (*Id.* 46.) Thus, the court found that WBL's reliance on the letter "makes no sense, given WBL's knowledge of the pending fraud suit, and also demonstrated willful blindness." (*Id.* 47.)

The court also concluded that WBL's closing of Loan Three substantially assisted Agbodjogbe's fraud with respect to the Pikesville Property. (Opinion 50-51.) It reasoned that "WBL consciously and culpably helped Agbodjogbe's fraud succeed by funding Loan Three, despite Al- Sabah's lis pendens, and putting Al-Sabah's money, presently in the form of equity in the Pikesville Property, beyond her reach." (*Id.* 50-51.) The court rejected WBL's argument that it could not have assisted Agbodjogbe's long-complete fraud. The court reasoned that (1) Agbodjogbe still owned the property free and clear before WBL's loan, and (2) WBL "consciously and affirmatively loaned Agbodjogbe $360,000 in exchange for first lien priority on the Pikesville Property, which denied Al-Sabah the opportunity to recoup her money from the home." (*Id.* 51-52.) It also rejected WBL's argument that a routine loan to Agbodjogbe could not constitute substantial assistance because WBL treated Agbodjogbe favorably as a repeat-customer and made exceptions to certain lending guidelines on Loan Three. (Opinion 55-56.)

The court thus held that Al-Sabah had established that WBL aided and abetted Agbodjogbe's fraud by closing Loan Three. (*Id.* 56.)

## SUMMARY OF ARGUMENT

In holding WBL liable for aiding-and-abetting Agbodjogbe's fraud, the court misapplied the law and made critical factual errors.

34168859.4

**First**, this Court should review *de novo* the district court's misapplication of substantial assistance law that led it to the erroneous conclusion that WBL's closing of Loan Three in May 2017 substantially assisted Agbodjogbe with a fraud he completed in January 2015. Al-Sabah's fraud claim against Agbodjogbe based on his purchase of the Pikesville Property with her money arose long before WBL ever met Agbodjogbe—and more than two years before WBL closed Loan Three. Further, Loan Three was a routine, arm's-length transaction between WBL and N&A Kitchen. The district court—in concluding that WBL substantially assisted Agbodjogbe under those circumstances—failed to apply legal principles that should have absolved WBL of liability.

**Second**, the district court's conclusion that WBL was willfully blind to Agbodjogbe's fraud with respect to the Pikesville Property when it closed Loan Three was clear error. Although WBL learned that there was a lis pendens on the Pikesville Property before the closing, there was no evidence that anyone at WBL understood the nature of Al-Sabah's claims on which the lis pendens was based. After a title insurer removed the lis pendens from the revised title report and issued a title insurance policy, WBL's policy against closing on loans secured by properties with an active lis pendens no longer created an impediment to closing. And WBL's receipt of an opinion letter from Agbodjogbe's attorney representing that no

23

litigation could adversely impact the loan gave WBL even less reason to suspect the lis pendens—which had been removed from the title report—was an issue.

The district court's erroneous conclusion turned on two critical mistakes. The first was the mistaken finding that WBL had knowledge of the contents of the Notice of Lis Pendens Al-Sabah filed, which detailed her fraud allegations against Agbodjogbe and specifically linked his ownership of the Pikesville Property to her claim of fraud. No evidence showed that any WBL employee ever saw that document (or the complaint filed against him, which was attached to it). This error distorted the court's entire analysis, as it repeatedly invoked WBL's purported knowledge of her fraud claim against Agbodjogbe when evaluating whether WBL's actions during the underwriting of Loan Three constituted willful blindness.

The district court's other key mistake was to fault WBL for decisions it made in underwriting Loan Three related to investigating the lis pendens, including Pardes's decision not to independently investigate the lis pendens after the title insurer removed the lis pendens from the title report. In doing so, the court transformed what should have been a willful blindness standard into a negligence standard.

If the Court finds error on either one of these issues, that is sufficient to overturn the district court's judgment in favor of Al-Sabah.

34168859.4

## STANDARD OF REVIEW

This Court applies a mixed standard of review to a judgment after a bench trial. *Virginia Elec. & Power Co. v. Bransen Energy, Inc.*, 850 F.3d 645, 654 (4th Cir. 2017). The district court's legal conclusions are reviewed *de novo*, and the district court's factual findings are reviewed for clear error. *Id*.

## ARGUMENT

The district court's decision improperly stretches the law of aiding-and-abetting to hold WBL liable for substantially assisting a fraud that Agbodjogbe completed over two years before WBL issued one of his entities a routine loan. And the court's conclusion that WBL was willfully blind to the underlying fraud was based on a mistaken finding that WBL employees had knowledge of the contents of a document none of them had ever seen. The court also misapplied the law by ascribing willful blindness to WBL for making what were, at most, underwriting mistakes that contributed to WBL's failure to uncover Agbodjogbe's fraud before closing Loan Three. All of these errors combined to create an unjust result, holding a business lender in a routine loan transaction liable as an aider and abettor of fraud that occurred well before the lender ever met the fraudster.

## I.   WBL's Routine Loan To Agbodjogbe in 2016 Did Not Substantially Assist Him With A Fraud He Completed in 2014.

WBL's liability in this case was based on a single transaction: Loan Three. That loan was secured with a mortgage on the Pikesville Property he purchased with

25

Al-Sabah's money over two years before the loan closed. Even though Agbodjogbe had long completed his fraud with respect to the Pikesville Property, the district court erroneously held that WBL's closing of Loan Three substantially assisted him in committing that underlying fraud. The common law principles of aiding-and-abetting liability summarized in *Twitter, Inc. v. Taamneh* show that conclusion is incorrect.

The district court reached its erroneous conclusion by making two mistakes. First, it incorrectly conceived of the underlying fraud as being completed only with the closing of Loan Three. Second, it compared WBL's conduct to more culpable defendants in inapposite cases instead of the applying the rule that routine transactions like Loan Three do not give rise to aiding-and-abetting liability.

### A.    WBL did not, as a matter of law, substantially assist Agbodjogbe in committing an underlying fraud against Al-Sabah.

WBL could not have substantially assisted Agbodjogbe's fraud against Al-Sabah because the fraud was complete well before WBL ever even met Agbodjogbe—let alone years before it ever issued Agbodjogbe's entities the business loan in question. Under Maryland law, aiding and abetting liability requires showing that the defendant "encouraged, incited, aided or abetted the act of the direct perpetrator" of an "*underlying tort*[]…." *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1049 (Md. 1995) (emphasis added). Although Maryland aiding-and-abetting case law is sparse, its highest court has noted the

similarity of its law on aiding and abetting to the common law applied in other states and federal cases. *Id.*; *see also Sutton v. FedFirst Fin. Corp.*, 126 A.3d 765, 792 (Md. App. Ct. 2015) (relying on another state's aiding and abetting case law).

The Supreme Court of the United States also recently demonstrated the similarity of aiding-and-abetting law across jurisdictions. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 484 (2023). Echoing the formulation in *Alleco*, *Twitter* explained that a defendant must be shown to "have aided and abetted (by knowingly providing substantial assistance) another person in the commission of *the actionable wrong*." *Twitter*, 598 U.S. at 495 (emphasis added). Put differently, the "point of aiding and abetting is to impose liability on those who consciously and culpably participated *in the tort at issue*." *Id.* at 506 (emphasis added).

*Twitter* endorsed a six-factor inquiry, derived from a survey of the common law on aiding-and-abetting, to assess whether the defendant's assistance of an underlying tort was substantial or not. Those factors are "(1) 'the nature of the act assisted,' (2) the 'amount of assistance' provided, (3) whether the defendant was 'present at the time' of the principal tort, (4) the defendant's 'relation to the tortious actor,' (5) the 'defendant's state of mind,' and (6) the 'duration of the assistance' given." *Id.* at 486. Further, in instructing courts on how to apply these factors, *Twitter* explained that "the more attenuated the nexus" between "the defendant's acts and the tort," the "more courts should demand that plaintiffs show culpable participation

27

through intentional aid that substantially furthered the tort." *Id.* at 506. That is consistent with case law evaluating substantial assistance as often determined by asking "whether the action of the aider and abettor proximately caused the harm on which the primary liability is predicated." *JP Morgan Chase Bank v. Winnick*, 406 F Supp. 2d 247, 256 (S.D.N.Y. 2005); *see also Empire Realty Co. v. Fleisher*, 305 A.2d 144, 147 (Md. 1973); *E.F. Hutton Mortg. Corp. v. Equitable Bank, N.A.*, 678 F. Supp. 567, 580 (D. Md. 1988) ("The essential inquiry insofar as causation is concerned is whether a defendant's conduct has caused the plaintiff's harm.").

With these principles in mind, each *Twitter* factor shows that WBL's closing of Loan Three could not, as a matter of law, have constituted substantial assistance. Loan Three was a routine, arm's length loan for WBL, which closed over two years after Agbodjogbe completed his underlying fraud with respect to the Pikesville Property. Those facts cause every *Twitter* factor to weigh against concluding that WBL substantially assisted Agbodjogbe's underlying fraud.

*First*, the "nature of the act assisted" was Agbodjogbe's defrauding Al-Sabah out of the money used to purchase the Pikesville Property. *Twitter*, 598 U.S. at 486. WBL's purported assistance involved lending Agbodjogbe $360,000 with a mortgage secured by the Pikesville Property on March 30, 2017, over two years after Agbodjogbe purchased it on January 28, 2015. (Opinion 6, 31 ¶¶ 40, 200.) Because WBL's purported assistance of Agbodjogbe took place over 26 months after

Agbodjogbe used Al-Sabah's money to purchase the Pikesville Property, *Twitter* thus "demand[s] that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." 598 U.S. at 506. Al-Sabah did not do so.

*Second*, keeping in mind that the "substantial assistance" must help the primary tortfeasor accomplish the "underlying tort," the "amount of assistance" WBL provided was none. *Id.* at 486. Agbodjogbe essentially stole money from Al-Sabah and used it to purchase a house for himself long before his first contact with WBL. It is undisputed that WBL played no role in helping Agbodjogbe induce Al-Sabah to send him this money or to purchase the Pikesville Property using it.

Yet even under a more expansive interpretation of this factor, WBL provided only *de minimis* assistance to Agbodjogbe long after-the-fact by providing him a routine loan. Only financial transactions that are "atypical" or "non-routine" may qualify as substantial assistance. *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 471 (S.D.N.Y. 2001) (holding that clearing house's failure to enforce margin requirements, which allegedly facilitated Ponzi scheme, did not constitute substantial assistance); *see also Texas Star Nut and Food Co., Inc. v. Tr. Bank*, 632 F. Supp. 3d 664, 671 (D. Md. 2022) (providing "usual banking services" is not substantial assistance). This makes sense, as substantial assistance requires a defendant's "active" participation in the fraud. *Schatz v. Rosenberg*, 943 F.2d 485, 497 (4th Cir. 1991).

The evidence at trial established that Loan Three was typical of the kind of lending WBL does. WBL's Chief Executive Officer—Doug Naidus—testified that WBL provides loans secured by real estate to small businesses. (Opinion 14, ¶ 100.) WBL has internal guidelines it uses to assess its own credit risk, but it regularly deviates from those guidelines as it sees fit. (*Id.* 15, ¶ 103.) In closing Loan Three, WBL adhered to its standard protocols for investigating the real estate used to secure a loan, including (i) obtaining an attorney letter containing certain representations about the borrower, guarantor, and collateral, and (ii) relying on a title insurer's evaluation and willingness to provide title insurance. (*Id.* 29, ¶ 188; Tr. Vol. II 143:8-15, 144:11-145:14.) In other words, WBL vetted and approved the closing of Loan Three by following its usual practices, consistent with how it would treat any other loan with a lis pendens that appeared on the collateral's title report.

*Third*, WBL was "not present at the time" of Agbodjogbe's "principal tort." *Twitter*, 598 U.S. at 486. Agbodjogbe defrauded Al-Sabah out of over a million of dollars in 2014 and early 2015 and used some of it to buy himself the Pikesville Property in January 2015. (Opinion 6 ¶ 40.) *Over two years later*, he used that house as collateral for Loan Three. (*Id.* 31 ¶ 200.) Not only was WBL not present for the principal tort, it was complete well before Agbodjogbe ever contacted WBL.

*Fourth*, WBL's "relation to the tortious actor" weighs against finding that WBL substantially assisted his fraud. *Twitter*, 598 U.S. at 486. WBL engaged in an

34168859.4

arm's length, routine lending transaction with Agbodjogbe. *Twitter*, 598 U.S. at 504 (noting "arm's-length relationship" deserves "great[] weight"). Although the evidence showed that Agbodjogbe's repayment history on two prior loans made WBL more willing to close Loan Three, the evidence also showed that would have been true of any customer who had repaid loans in the past. (Tr. Vol. I 106:20-107:3 (noting "payment history" is a factor WBL "consider[s] on approving all loans").) In other words, WBL did not "treat[] [Agbodjogbe] any differently from anyone else." *Twitter*, 598 U.S. at 500. Approximately 35% of WBL loans go into default, so it is unremarkable that WBL would consider prior repayment history in a positive light during underwriting. (Tr. Vol. II 130:5-11.)

*Fifth*, WBL lacked a culpable "state of mind." *Twitter*, 598 U.S. at 486. This factor focuses on the "defendants' state of mind with respect to their actions and the tortious conduct…." *Id.* at 504. Because no evidence suggests WBL "intend[ed] to support" Agbodjogbe in defrauding Al-Sabah (*id.* at 505), but that it only hoped to profit off a loan to him as it would any other borrower, this factor too weighs against a finding of substantial assistance.

*Sixth*, the "duration of the assistance" WBL provided was short. *Twitter*, 598 U.S. at 486. WBL's liability is based on assisting only one act—approving Loan Three—that took less than a month from the initial application to funding. (Opinion 25, 31, ¶¶ 167, 200.) The district court's decision is extraordinary in that it deems

31

WBL's assistance substantial even though there is no evidence of ongoing assistance of Agbodjogbe.

For all of these reasons, Loan Three could not—as of matter of law—have constituted WBL's substantial assistance of Agbodjogbe's fraud against Al-Sabah.

**B.     The district court's substantial assistance conclusion misapplies the law.**

In concluding that WBL substantially assisted Agbodjogbe, the district court misapplied the law in at least two ways. First, it incorrectly held that Agbodjogbe's underlying fraud was ongoing and thus capable of being assisted by WBL. Second, it failed to apply a widely adopted principle of substantial assistance law, which is that routine transactions cannot constitute substantial assistance.

**1.     The district court erred in concluding that WBL's loan substantially assisted an ongoing fraud by Agbodjogbe.**

The district court's first mistake was to reject the premise that "Agbodjogbe's fraud was complete" before WBL closed Loan Three, "even though, by [that] point Agbodjogbe had already obtained Al-Sabah's money and purchased the Pikesville Property without her knowledge." (Opinion 51.) Although the district court did not frame its analysis around the *Twitter* factors, this error infected its entire analysis— particularly on considerations relevant to factors (1) and (3)—by distorting the "nature of the act assisted" into a years-long scheme that culminated with WBL's loan and by effectively assuming that WBL was present for the underlying fraud.

The district court's error flowed from its misapplication of two cases. The first is *Kafka v. Hess*, Civ. No. JKB-16-1757, 2017 WL 2439142, at *9 (D. Md. June 6, 2017), which it cited for the proposition that a "wrongdoer's fraud may not be complete unless and until damage to a plaintiff occurs, such as when the plaintiff 'would be entitled, but was denied the opportunity, to assume sole ownership' of fraudulently transferred property." (Opinion 51.) Based on *Kafka*, the court reasoned that WBL assisted Agbodjogbe's fraud by denying Al-Sabah "the opportunity to claim title [to the Pikesville Property] when it secured a first priority lien" despite her filing of a lis pendens prior to WBL's approval of the loan. (*Id.*)

*Kafka*, however, did not involve aiding-and-abetting. It applied the discovery rule to a fraud claim based on a decedent's will where the damages from the alleged fraud necessarily could not accrue until the decedent died and the putative heir was denied an inheritance as a result of the fraud. 2017 WL 2439142, at *9. Unlike the heir in *Kafka*, Al-Sabah was deprived of her money immediately upon Agbodjogbe's misappropriation of it, and certainly no later than when Agbodjogbe used it to purchase the Pikesville Property for himself without her permission.

Indeed, as the district court acknowledged, Al-Sabah had *already sued Agbodjogbe for fraud related to the Pikesville Property* before WBL closed Loan Three, confirming that her fraud claim (and damages) had already accrued under the discovery rule applied in *Kafka*. 2017 WL 2439142, at *9 ("fraud accrues as of the

33

date of discovery of the fraud"). Thus, the district court was wrong that *Kafka* shows that Agbodjogbe's fraud with respect to the Pikesville Property was not complete when WBL closed Loan Three. And because the court was wrong about that, the court's conclusion that WBL assisted Agbodjogbe in completing the fraud was also an error.

The other case the district court erroneously relied on was *In re Rood*, 482 B.R. 132 (Bankr. D. Md. 2012). (Opinion 51-52.) The court compared Agbodjogbe to the *pro se* co-defendant (COO, Jewell) of the primary fraudster (CEO, Rood), who was found liable for fraud and conspiracy in the *Rood* matter. (*Id.* 52.) The district court noted that Jewell "did not work on the transaction [in question] until two years after Rood had misappropriated the funds, did not directly communicate with the victim of the fraud, and did not participate in the scheme," but was "nevertheless found" to have "'provided substantial assistance to' Rood's scheme." (Opinion 52 (quoting *Rood*, 482 B.R. at 147-48).) Although *Rood* has a specious parallel in that it involves a loan made two years before the alleged aider-and-abettor's involvement, the facts that resulted in Jewell's liability have no parallel here.

The court's discussion in *Rood* is a bit muddled, but one aspect is clear: Jewell's liability was based primarily on his *joining Rood's conspiracy*. *Id.* at 148. WBL did not conspire with Agbodjogbe, nor can its arm's-length relationship with Agbodjogbe reasonably be compared to Jewell's status as COO of the company

where the primary fraudster was its CEO. Further still, although the loan in *Rood* originated two years before Jewell's involvement, the *misappropriation* of funds did not occur until Jewell was involved (whereas here the misappropriation occurred years before WBL made the loan in question and more than a year before WBL had even met Agbodjogbe). *In re Rood*, 482 B.R. at 148.

The court's faulty application of *Kafka* and *Rood* caused it to incorrectly conclude that the primary tort in question was ongoing at the time of Loan Three and not complete until it closed. That mistake is reversible error because, to establish liability, Al-Sabah needed to prove that WBL's actions must have "aided or abetted the act of the direct perpetrator" of an "underlying tort[]…." *Alleco*, 665 A.2d at 1049. Because, contrary to the district court's view, the primary tort in question was long complete before WBL entered the picture, its decision should be reversed.

## 2. The district court erred in concluding that a routine loan from WBL constituted substantial assistance.

The district court's second error was to reject the premise that WBL's loan to Agbodjogbe was routine and thus, as a matter of law, not substantial assistance. The court instead concluded that WBL "effectively drove Agbodjogbe's getaway car, allowing him to permanently siphon away the money he fraudulently obtained and used to purchase the Pikesville Property." (Opinion 53.) WBL supposedly did this by "consciously and affirmatively loan[ing] Agbodjogbe $360,000 in exchange for first lien priority on the Pikesville Property," and "hastily fund[ing] Loan Three to

35

secure the business opportunity and arrang[ing] for the removal of the lis pendens from the updated title policy" because it "'had much to gain' by forging ahead on Loan Three without further investigating Agbodjogbe's fraud." (Opinion 52-53 (quoting *SEC v. Aragon Cap. Advisors, LLC*, No. 07 Civ. 919 (FM), 2011 WL 3278907, at *18 (S.D.N.Y. July 16, 2011)).)

Stripped of negative adjectives, this amounts to saying WBL closed a secured loan with Agbodjogbe quickly because it hoped to profit from it. *That describes every WBL loan.* As discussed above, all of WBL's loans are secured by real property. And WBL regularly asks title insurers to remove blemishes that show up on the initial title report. (Tr. Vol. II 143:7-15.) WBL customers often come to WBL to fund for an immediate need, so WBL's consideration of loans often happens at a fast pace. (Tr. Vol. II 164:10-20 (explaining that WBL's client's needs are "situational" and so it "move[s] very quickly" to accommodate that "particular need[] of the small business community").)

In other words, as explained above, Loan Three was a routine loan for WBL. The district court was wrong to reject that premise, which led it to incorrectly distinguish case law providing that a routine lending transaction cannot amount to substantial assistance. Specifically, the court considered Loan Three unusual because (1) WBL had a favorable view of Agbodjogbe because he was a "repeat customer," and (2) WBL "considerably deviated from its normal business practices"

by making "several notable exceptions" to its lending guidelines and policies for Agbodjogbe. (Opinion 55-56.)

Neither of those facts is nefarious or shows that Loan Three was unusual for WBL. It is logical for a lender to view a borrower with positive payment history more favorably—that is a foundational principle of credit, and it applies with even greater force in WBL's high-risk portfolio. And the evidence showed that the exceptions WBL made for Loan Three were minor and that WBL makes exceptions in its ordinary course of business. (Tr. Vol. II 171:9-25.)

These mistakes led the district court to reject the routine lending cases and instead rely on cases with aiders-and-abettors who were directly involved with the underlying fraud for a period of years. (*See* Opinion 52-53.) But this case did not, as the district court suggests (*id.* 53), involve WBL's "participation in a symbiotic fraudulent scheme" similar to the one in *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450 (S.D.N.Y. 2001), where brokers regularly changed their ratings of bonds upon request, which helped those selling the bonds defraud investors by manipulating the bonds' performance history. *Id.* at 512.

Nor can WBL be compared to the broker in *Armstrong v. McAlpin*, who closed every fraudulent "churning" transaction for the primary fraudster for *ten years*. 699 F.2d 79, 91-92 (2d Cir. 1983), or the accountholders in *Aragon Cap. Advisors, LLC*, who profited for years from insider trades they knew they did not make. 2011 WL

3278907, at *17 (both cited in Opinion 53). The district court's analysis incorrectly framed the defendants' profit-motive in *Primavera*, *Armstrong*, and *Aragon* as the key factor, and then drew a parallel to WBL's (*See* Opinion 53.). But the court's reading of those cases downplays significant differences in culpability and involvement in the primary fraud between those defendants and WBL.

Additionally, the court's incorrect view about whether Agbodjogbe's underlying fraud was complete before Loan Three closed permeated its analysis of these issue and contributed to its failure to apply the law correctly. The court relied on *Schatz*, which holds that an attorney is liable for aiding-and-abetting securities fraud only if he "actively participate[s] in soliciting sales or negotiating terms of the deal on behalf of a client," as the lawyer must "render[] 'substantial assistance' to the primary securities law violation, not merely to the person committing the violation." 943 F.2d at 497. Because Agbodjogbe's primary tort was complete before WBL closed Loan Three, the principle in *Schatz* confirms that WBL was not directly involved and cannot be liable for aiding and abetting it.

These errors led the district court to incorrectly refuse to conclude, based on the routine-transaction cases, that WBL did not substantially assist Agbodjogbe's fraud. Again, although the district court did not frame its analysis using the *Twitter* factors, these mistakes distorted the court's analysis of the considerations underlying factor (2), by distorting "the 'amount of assistance' [WBL] provided"; factor (4), by

38

mistaking WBL's "relation to the tortious actor" as cozy instead of arm's length; and factor (5), by viewing WBL's "state of mind" as more culpable than it was in reality. *Twitter*, 598 U.S. at 486. Thus, the court misapplied substantial assistance law, and the judgment against WBL should be reversed.

## II.    WBL Was Not Willfully Blind to Agbodjogbe's Fraud When It Closed Loan Three.

The evidence at trial showed that WBL followed its usual practices in addressing the lis pendens on the title report for the Pikesville Property before closing on Loan Three. Those actions demonstrate that WBL neither suspected Agbodjogbe committed fraud nor sought to avoid learning about it. The district court's conclusion to the contrary incorrectly assumed WBL employees knew the nature of Al-Sabah's fraud allegations against Agbodjogbe, distorting its view of WBL's intent. And the court's analysis sounded more in negligence than in willful blindness, as it criticized WBL for the decisions it made when addressing the lis pendens that led it not to discover Agbodjogbe's fraud.

### A.    WBL's actions following its discovery of the lis pendens on the Pikesville Property show that it did not suspect Agbodjogbe's fraud or seek to avoid learning about it.

Aiding and abetting liability requires proof "that the aider and abettor '*knowingly* and substantially assist[ed] the principal violation.'" *Sutton*, 126 A.3d at 792 (emphasis added). One way of proving a defendant's actual knowledge is to prove that it was "willfully blind." The Maryland Court of Appeals (then, the

34168859.4

Maryland Supreme Court) has explained that "willful blindness to fraudulent activity … suffices as actual knowledge" of fraud "when a person 'has his suspicion aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance.'" *Hoffman v. Stamper*, 867 A.2d 276, 302 (Md. 2005) (quoting *State v. McCallum*, 583 A.2d 250, 253–54 (1991) (Chasanow, J., concurring)). *Hoffman* specifically refers to "willful blindness to fraudulent activity." *Id*.

While Maryland law on this issue is sparse (as it is for aiding and abetting liability in general), Maryland courts look to persuasive authority across jurisdictions to understand the contours of willful blindness. *See Alleco Inc.*, 665 A.2d at 1049-50 (noting doctrine "has been uniformly recognized by cases elsewhere," and citing cases from various jurisdictions). Myriad cases confirm that an aider-and-abettor's willful blindness must be blindness to the primary actor's wrongful conduct (here: the fraud with respect to the Pikesville Property). As the Supreme Court of the United States put it, "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). For aiding-and-abetting fraud in particular, a plaintiff must show "that a defendant made certain decisions specifically to avoid attributable knowledge of the underlying fraudulent scheme." *Iowa Pub. Employee's Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 345

40

(S.D.N.Y. 2013) (citing *In re Agape Litig.*, 773 F. Supp. 2d 298, 309 (E.D.N.Y. 2011)).

The issue is whether WBL suspected—but took deliberate steps to avoid confirming—that Agbodjogbe was engaged in the fraudulent scheme WBL was accused of aiding and abetting. That is, that WBL suspected Agbodjogbe purchased the Pikesville Property using fraudulently obtained proceeds. WBL's discovery of that lis pendens *could* have led WBL to learn the details of Al-Sabah's claims against Agbodjogbe. But the evidence showed that nobody at WBL ultimately read Al-Sabah's complaint or the Notice of Lis Pendens because of intervening circumstances. (*See* Tr. Vol. I 111:22–112:1 (Oztreves); Tr. Vol. II 143:2-4 (Pardes); Tr. Vol. II 190:11–15 (Naidus).) Nor did anyone involved in approving the loan connect Al-Sabah (as the sender of the wires to Agbodjogbe) to the name of the plaintiff in the case against Agbodjogbe associated with the lis pendens. (*See, e.g.*, Tr. Vol. II 117:22–118:7 (Oztreves); DTX031 at 52 (notation in list of judgments for Al-Sabah case stating "to be removed, this is prior owner").)

Instead, the evidence showed that WBL treated the lis pendens from Al-Sabah's lawsuit as it would any other lis pendens that arose during closing—a common occurrence for WBL loans. Pardes testified that the lis pendens was escalated to him during closing, but the title company decided to insure over the lis pendens before he investigated it. (Tr. Vol. II 142:18–143:21.) He testified that

WBL's usual practice is for him to investigate only issues that remain unresolved after the title insurance process clears outdated or irrelevant blemishes. (*Id.* 144:3–10.)

WBL also received an attorney opinion letter, which stated that no "threatened or pending litigation" posed a risk to the borrower's or guarantor's ability to perform their obligations. (DTX031 at 103.) WBL's underwriting guidelines require an attorney opinion letter in substantially this form, though the attorney is free to mark up the letter within their professional judgment, subject to WBL's approval. (Tr. Vol. II 141:21-142:14, 144:11-17.) The letter WBL received states that these representations were made "after due inquiry," which is a term of art intended to specify the standard of care the attorney exercised in making the representations. (*Id.* 144:21-145:14.)

Having received an updated title commitment and a letter from Agbodjogbe's attorney, WBL believed that it had sufficiently vetted whatever litigation may have led to the appearance of the lis pendens on the initial title report. (*Id.* 145:15-19.) That investigation did not lead to the discovery of Agbodjogbe's fraud, but there is no evidence it was calculated to avoid discovering a suspected fraud by Agbodjogbe or otherwise.

**B.    The district court's conclusion that WBL was willfully blind is based on a key factual error and misapplied the law.**

In rejecting WBL's argument that it was not willfully blind to Agbodjogbe's fraud with respect to the Pikesville Property, the district court focused on what WBL did with the information certain low-level employees learned about the lis pendens on that property. Again and again, however, the court's analysis chided WBL for failing to discover Agbodjogbe's fraud. Not only did the court get the facts wrong— its analysis criticizes WBL for ignoring the contents of a document no evidence established anyone at WBL had ever seen—but the supposed shortcomings of WBL's investigation do not establish that WBL *suspected* Agbodjogbe had purchased the Pikesville Property with fraudulently obtained funds and *willfully sought to avoid* confirmation of that fact. At most, they show that WBL was negligent, or perhaps even reckless, in funding Loan Three.

**1.    The district court erroneously found that WBL saw the Notice of Lis Pendens and knew its contents.**

To start, a critical and clearly erroneous factual mistake skewed the district court's entire willful blindness analysis. The court found that "as WBL processed Loan Three, it became aware that … the Notice of Lis Pendens included Al-Sabah's fraud complaint filed in federal court against Agbodjogbe and several of his business entities," and then proceeded to use the substance of the Notice of Lis Pendens to

rebut the explanations of WBL witnesses as to why they proceeded to close Loan Three. (Opinion 44-45.)

Consider the court's rejection of Pardes's explanation as to why he relied on the title insurer's removal of the lis pendens from the title policy. Pardes testified that his understanding was that the insurer found the lis pendens did not apply to the Pikesville Property. (*Id.* 45.) The court rebuked Pardes for this, noting that "only the last page of the Notice of Lis Pendens contains a recording document for an unrelated address," and that the rest of the document detailed Al-Sabah's "fraud allegations" against Agbodjogbe and "establish that she was contesting title to the Pikesville Property." (*Id.*; *see also id.* 49 ("Pardes declined to investigate the specifics of the lis pendens any further based on a questionable and improbable belief that the lis pendens applied to a different property.").) But Pardes was not explaining that *he thought* the lis pendens did not apply to the subject property. In fact, he testified that he *never saw* that document. (*See* Tr. Vol. II 143:2-6.) He was merely relaying his understanding of why the title insurer acted as it did.

Similarly, the court used WBL's purported knowledge of "the lis pendens and information about the related fraud suit" to find that its reliance on an Agbodjogbe's attorney opinion letter "demonstrated willful blindness." (Opinion 47.) But no evidence supports the court's attribution of knowledge of the contents of the Notice of Lis Pendens to WBL. Not one WBL witness testified that they ever saw this

44

document before Loan Three closed, and in fact the testimony from all of the live WBL witnesses confirms that they had not seen it. (*See* Tr. Vol. I 111:16-21 (Oztreves); Tr. Vol. II 143:2-6 (Pardes); Tr. Vol. II 179:1-4, 190:11-19 (Naidus).)

Indeed, if any WBL witness had reviewed this document, one would anticipate that it would have been a focal point of Al-Sabah's cross-examination, as the Notice of Lis Pendens contained allegations that Agbodjogbe purchased the Pikesville Property with money he fraudulent obtained from Al-Sabah. The fact that no cross-examination on this topic is in the record further demonstrates that none of them saw it.

This error by the district court distorted its entire analysis of the willful blindness element, as it incorrectly led the court to view all of the evidence through a lens that assumed WBL knew more about Agbodjogbe's fraud than it did. It is, by itself, grounds for reversal, as the evidence overwhelmingly shows that WBL knew next to nothing about the lis pendens—other than its existence and the case name— and justifiably followed its usual practice of relying on an attorney letter and title insurer's willingness to insure over it in deciding to close the loan.

## 2. The district court's willful blindness analysis incorrectly applied a negligence standard.

The district court also repeatedly faulted WBL for mistakes it made in deciding to close Loan Three, even though those mistakes do not show that WBL suspected Agbodjogbe's fraud but deliberately sought to avoid learning the truth

about it. In doing so, the court lowered the bar for proving willful blindness to that of proving negligence.

First, take the district court's rejection of WBL's reliance on the title insurer's removal of the lis pendens from the revised title report and willingness to provide a title policy for the Pikesville Property. WBL witnesses testified that they understood the insurer's decision to omit the lis pendens meant that the insurer had given them "clean title." (Opinion 45.) The court rejected this argument in large part based on the policy's language, which states that it is "not a representation as to the state of title…." (*Id.* (quoting Fakioglu Dep. Ex. 54 (capitalization from original omitted)).) At most, that shows that WBL employees misunderstood the technical legal effect of the title policy. And they did so by following WBL's usual practice of relying on the insurer's decision to issue a policy. (*See* Opinion 46 (Pardes testifying that his practice is only to investigate issues unresolved by title insurer); *see also* Vol II. Tr. 116:15-23, 118:8-13.) Perhaps the policy language also demonstrates that WBL's practice is unsound, but WBL's following that practice here does not show it suspected but sought to avoid uncovering fraud.

Similarly, the district court faulted WBL for following its usual practice of relying on an attorney opinion letter with respect to the state of the collateral and related litigation. (Opinion 46-47.) The district court noted there is "no evidence" whether the attorney who signed the letter knew about the lis pendens or

Agbodjogbe's fraud suit, and that it was "unclear" which title commitments the attorney reviewed. (*Id.* 46-47.) And so the district court faulted WBL for relying on the letter not calculated to specifically vet those issues.

The court's criticism of WBL is, of course, bound up in its mistaken belief that knew that the lis pendens related to a "pending fraud suit." (*Id.* 47.) But even putting that aside, its rebuke of WBL for relying on a "form letter" that "the attorney signed … without much, if any, substantive change" is at most a finding of negligence, not willful blindness. (*Id.* 47 n.32.) Again, WBL followed its standard practice of obtaining an attorney letter to vet these issues, with the assumption that the attorney would follow the appropriate standard of care for such letters. (Tr. Vol. II 144:21-145:14.) Perhaps, under the circumstances, WBL should have demanded more detail from the attorney, but that would at most amount to negligence.

Finally, the district court faulted WBL for having "the infrastructure in place to connect the dots and investigate the matters further, but it chose not to."(Opinion 48.) The court stated that Fakioglu, a lower-level employee with no decision-making authority over approving the loan, knew that the lawsuit that the lis pendens related to was filed by "Al-Sabah, the person who wired large sums of money to Agbodjogbe," and communicated the issue to other employees, including one in the title department. (*Id.*) The title department's escalation of the issue is what led Pardes to get involved, but—as explained above—Pardes ended up not investigating the

34168859.4

issue once he learned that the title insurer removed the lis pendens from the policy. (*See id.* 49.) The court described Pardes's decision as "the essence of willful blindness," even though there is no evidence that Pardes knew anything about the nature of Al-Sabah's lis pendens when he declined to investigate. At most, this was a mistaken resort to WBL's usual procedures when the circumstances called for a reasonably prudent person to do more, but it was not a deliberate effort to avoid uncovering fraud. The district court's willful blindness finding was thus clear error.

## CONCLUSION

For the reasons set forth herein, the Court should reverse the district court's judgment in favor of Al-Sabah on Loan Three.

Dated: September 16, 2024

Respectfully submitted,

/s/ Stephen J. Rosenfeld

Stephen J. Rosenfeld
MCDONALD HOPKINS LLC
300 North LaSalle, Suite 1400
Chicago, IL 60654
(312) 280-0111
srosenfeld@mcdonaldhopkins.com

*Attorney for Defendant-Appellant and Cross-Appellee*

48

# CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 24-1345    Caption: Al-Sabah v. World Business Lenders, LLC

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains _____10,805____ [*state number of*] words

☐ this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word _____ [*identify word processing program*] in
Times New Roman 14pt font _____ [*identify font size and type style*]; **or**

☐ this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Stephen J. Rosenfeld

Party Name World Business Lenders, LLC

Dated: 9 / 16 / 2024

04/12/2020 SCC

## CERTIFICATE OF SERVICE

I, Stephen J. Rosenfeld, a member of the Bar of this Court, hereby certify that on September 16, 2024, I electronically filed the foregoing "Opening Brief of Appellant World Business Lenders, LLC" with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Stephen J. Rosenfeld

Stephen J. Rosenfeld
*Attorney for Defendant-Appellant and Cross-Appellee*

34168859.4